1

2

3

4

5 IN THE UNITED STATES BANKRUPTCY COURT

6 FOR THE DISTRICT OF ARIZONA

7

8 | Chapter 7

9 In Re | Case No. 2:05-bk-20725-SSC

10 LUCIE ROCA,

11

12 Debtor.

13 DAVID A. BIRDSELL, CHAPTER 7 | Adv. No. 07-ap-00478
TRUSTEE,

14 | **AMENDED**[1]
Plaintiff, | **MEMORANDUM**
| **DECISION CONCERNING A**
15 LUCY N. ROCA, | **FRAUDULENT CONVEYANCE**

16 Defendant.

17

18 I. INTRODUCTION

19          This matter comes before the Court on a "Complaint to Avoid Fraudulent

20 Transfer of Property" ("Complaint") filed with the Court on August 31, 2007 by the Chapter 7

21 Trustee ("Trustee").  An "Answer to Complaint to Avoid Fraudulent Transfer of Property" was

22 filed on October 3, 2007 by the Defendant, Lucy N. Roca, the Debtor's mother ("Defendant").

23 After an  appropriate amount of time for discovery and other pretrial matters, this Court

24

25

26 ────────────────

    **1.** The Court's Memorandum Decision was amended to correct a typographical error on
27 page 16, Line 19.

28                                          1

conducted a trial on September 16, 2008, and thereafter took the matter under advisement.[2]

Taking into account the evidence presented at trial, the arguments of the parties, the documents filed, and the entire record before the Court, the Court has set forth in this decision its findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52, Bankruptcy Rule 7052. The Court has jurisdiction over this matter, and this is a core proceeding. 28 U.S.C. §§ 1334 and 157 (West 2008).

## II. FACTUAL BACKGROUND

On or about September 6, 2004, Lucie Roca, the Debtor ("Debtor") and her mother, the Defendant, purchased real property located at 2205 W. Clearview Trail, Anthem, Arizona 85086 ("Anthem Property"),[3] which had an appraised value of $370,000.[4] The Debtor and Defendant took legal title to the Anthem Property via Warranty Deed as joint tenants with the right of survivorship.[5] Additionally, the Debtor and Defendant were co-borrowers on the loan issued by Aegis Wholesale Corporation ("Aegis"), which was used to purchase the Anthem Property. The Debtor testified at the time of trial that the Aegis loan was necessary because the Defendant still owned her home in New Jersey, and the Debtor and the Defendant did not have the requisite financing to purchase the Anthem Property without the Aegis loan.

As to the home in New Jersey, the Debtor and the Defendant testified that the Defendant had resided there for a substantial period of time. However, after the death of the Defendant's husband, the Debtor assisted the Defendant with the upkeep and other financial matters as to the New Jersey property. For the convenience of the Defendant, the Debtor and the

---

**2.** The parties agreed to a discovery cutoff date of March 31, 2008, which was extended by them to July 16, 2008. See Docket Entries No. 16 and 18. The parties filed their joint pretrial statement on September 9, 2008, which is Docket Entry No. 22.

**3.** Docket Entry No. 22, ¶3, Stipulated Fact.

**4.** Docket Entry No. 22, ¶8.

**5.** Docket Entry No. 22, ¶3.

2

Defendant decided to sell the New Jersey property and have the Defendant reside with the Debtor. The Debtor testified that to prepare for the sale, she and the Defendant obtained a loan, as co-borrowers, secured by a deed of trust on the New Jersey property. Soon after the closing occurred on the Anthem Property, the refurbished home in New Jersey where the Defendant then resided was sold, and the Defendant moved to Arizona to reside at the Anthem Property. After payment of all liens encumbering the New Jersey property, a cashier's check in the names of the Defendant and the Debtor was issued. The Debtor was a co-borrower on at least one lien encumbering the New Jersey property.

On April 1, 2005, the Debtor and Defendant fully refinanced the Aegis loan on the Anthem Property through Bank of America N. A.[6] The Debtor and the Defendant were named as co-borrowers on the Bank of America loan. On the date the Aegis loan was refinanced, the Debtor and Defendant presented the Bank of America with a cashier's check in the amount of $200,000, resulting in a net loan amount of $97,860. The cashier's check contained the names of both the Debtor and the Defendant.

On April 25, 2005, the Debtor transferred her interest in the Anthem Property to the Defendant via Warranty Deed.[7] While the Warranty Deed indicates that the Defendant paid the Debtor $10.00 and other valuable consideration for the Debtor's interest in the Anthem Property, the Debtor testified that she received no consideration from the Defendant.[8]

According to the Debtor, at the time of the transfer: (i) she was working for an airline and being paid $7.50 per hour, (ii) she had between $5,000 to $10,000 in the bank, (iii) her business had approximately $50,000 in credit card debt, and (iv) she was current on all

---

**6.** *See* Exhibit 5.

**7.** Docket Entry No. 22, ¶4.

**8.** *Also see* Docket Entry No. 22,¶5. The stipulated fact was that "[t]he Debtor did not receive anything from the Defendant in exchange for the Debtor's transfer of her interest in the Property to the Defendant."

3

payments to her creditors. The parties also stipulated that at the time of the April 25, 2005

transfer, the value of the Debtor's assets was less than the amount of the Debtor's liabilities.[9]

On October 5, 2005, slightly less than six months after the Debtor transferred her

interest in the Anthem Property to the Defendant, the Debtor filed her Chapter 7 bankruptcy

petition. The Debtor listed herself as owner of the Anthem Property on Schedule A.[10] She

valued her interest at $240,000, and listed the Anthem Property as being encumbered by a

$98,000 lien. The Debtor also listed a monthly rent or mortgage payment of $856.00 on

Schedule J. Further, the Debtor's Statements did not list any transfers of property within one

year prior to the filing of her bankruptcy petition. At the trial, the Debtor provided no

explanation as to why she was listed as the owner of the Anthem Property, other than to say that

the Schedule was in error.

The Debtor initially testified that the monthly payment listed on Schedule J

represented the amount that she was paying to the Defendant each month in rent. She also stated

that she did not make the mortgage payments. However, the Plaintiff attacked the credibility of

the Debtor by entering into evidence various bank statements reflecting that the Debtor had made

the mortgage payments, each in the amount of $586.72, to Bank of America on July 7, 2005,

August 10, 2005, and October 7, 2005.[11] The Debtor admitted to having made these payments,

but stated that the Defendant was actually providing the funds for these payments. The Debtor

explained that she was making these payments on behalf of the Defendant for purposes of

convenience, since the Defendant was unable to make electronic payments. There is no credible

evidence to reflect that the Defendant was separately providing funding to the Debtor to make

the mortgage payments.

The Plaintiff also entered into evidence a copy of the Debtor's 2005 U.S.

---

**9.** Docket Entry No. 22, ¶6.

**10.** Also see Docket Entry No. 22, ¶7.

**11.** *See* Exhibit 9.

4

1    Individual Income Tax Return (Form 1040) ("Tax Return").[12]  The Debtor listed the Defendant

2    as a dependent and filed a Schedule A, Itemized Deduction worksheet, which included a

3    mortgage interest and points deduction by the Debtor in the amount of $11,021.[13]  The Debtor,

4    however, testified that the entire mortgage interest and points deduction was attributable to the

5    Defendant.

6          As of September 9, 2008, the parties stipulated that according to an internet cite

7    which places an approximate value on real estate, the Anthem Property had a value of $334,500,

8    and was encumbered by liens in the aggregate amount of $180,000.[14]  The Debtor testified that it

9    was necessary to obtain a second lien on the Property to payoff the Defendant's credit card

10   debts.  However, there is no credible evidence to reflect that the Defendant had any credit card

11   debt.  Rather, the Debtor admitted during her testimony that she had previously had a business,

12   that it had failed, and that she had incurred considerable credit card debt in attempting to save it.

13   Of further concern as to the increase in the amount of the encumbrances against the Property

14   after the April 25, 2005 transfer is the Debtor's testimony that the first lien on the Property

15   provided for "negative amortization," a financing term which allowed the Debtor and the

16   Defendant to pay less than the interest which was accruing on the principal amount of the loan.

17   As a result, the principal balance of the first lien was increasing in amount over time which had

18   the effect of decreasing the amount of the Debtor's and Defendant's equity in the Property.

19          When the Trustee questioned the Defendant as to how there was an

20   increase of at least $100,000 in the amount of the debt against the Property between the April 1,

21

22     **12.** *See* Exhibit  16.

23     **13.** The interest which was paid was the amount of $10,792.

24     **14.** Docket Entry No. 22, ¶¶ 9, 10, 11, and 12. Also *see* Exhibits 12 and 13, which
     reflect that the GMAC paid Bank of America in full, and held the first lien on the Property, and
25   the Debtor and the Defendant obtained a second lien on the Property in favor Deer Valley Credit
     Union. Unfortunately, the only exhibits provided to the Court are monthly statements and not
26   the underlying loan documents. Therefore, it is not clear to the Court when the loans were
27   obtained or the original amount of the loans.

28                                               5

2005 refinancing of the Aegis loan and the filing of the joint pretrial statement on September 9, 2008, the Defendant had no reasonable explanation.  The Debtor later testified that the Defendant was  "confused," but she could not quantify why the indebtedness had increased other than to state that the Debtor and the Defendant had paid the "mother's" credit card debt, which was not supported by the record.

III. ISSUES

A.     WHETHER THE TRANSFER WAS SIMPLY ALLOWING THE DEFENDANT
       TO QUIET TITLE IN HER NAME.

B.     WHETHER A "TRANSFER" OCCURRED UNDER SECTION 548.
       1.  Whether the Debtor had an interest in the Property.
       2.  If the Debtor had such an interest, whether the interest had value.
       3.  Whether the transfer of exempt property, under Arizona law, created an
       exception to the provisions of Section 548.

C.     UNDER SECTION 548, WHETHER THE TRANSFER WAS ACTUALLY
       FRAUDULENT AS TO THE DEBTOR'S CREDITORS.

D.     UNDER SECTION 548, WHETHER THE TRANSFER WAS
       CONSTRUCTIVELY FRAUDULENT AS TO THE DEBTOR'S CREDITORS.

E.     WHETHER THE TRUSTEE MAY RECOVER THE PROPERTY OR THE
       VALUE OF   THE TRANSFER OF THE DEBTOR'S INTEREST IN THE
       PROPERTY UNDER SECTION 550.

F.     WHETHER THE TRUSTEE MAY AVOID THE TRANSFER UNDER
       ARIZONA'S UNIFORM FRAUDULENT TRANSFER ACT, AS
       INCORPORATED BY SECTION 544(b).

       Within each of the issues, the parties have set forth various sub-issues that must also be resolved by the Court.  For instance, the Defendant states that the transfer could not be a fraudulent conveyance, because (1) the Debtor conveyed nothing of value to the Debtor, and (2) a transfer of exempt property is an exempt transaction not subject to avoidance.  Although not articulated by the parties as an issue, the Defendant also discusses what is a fraudulent

6

conveyance under Arizona law, and then applies that analysis to the fraudulent conveyance

provisions under the Bankruptcy Code. As will be discussed in this decision, the Court

concludes that the Trustee has carried his burden of proof as to whether the transfer was a

fraudulent conveyance under Section 548, but has not made the requisite showing of a fraudulent

transfer under Section 544 of the Bankruptcy Code. Finally, this decision is complicated by the

fact that the Trustee did not provide evidence of the value of the transfer as of April 25, 2005,

when it occurred. However, the Trustee seeks the turnover of the value of the transfer, as of the

time that it occurred, under Section 550 of the Bankruptcy Code. The parties have stipulated to

the value of the Anthem Property on September 6, 2004, the Debtor has listed the value of the

Property as of October 5, 2005, when she filed her bankruptcy petition, and the parties have

stipulated as to the value of the Property as of September 9, 2008.

## IV. DISCUSSION

The Trustee seeks to set aside the Debtor's pre-petition transfer of the Property to

the Defendant as fraudulent under 11 U.S.C. §§ 548(a)(1) and 544(b). At the time of trial, the

Trustee focused his burden of persuasion on Section 548. Perhaps the Trustee believed that the

provisions were coextensive and that proof under one provision would be sufficient to sustain his

burden of proof under the other Section. However, as will be shown hereinafter, the Sections

have different meanings, presumably to provide different types of strong-arm powers to the

Trustee. In turn, the Defendant presented a number of arguments that the transfer did not meet

the definition of a fraudulent transfer, that the Trustee had not proven all elements of a

fraudulent transfer, that the Trustee had not shown that any value should be turned over to the

estate under Section 550 of the Bankruptcy Code, and that the transfer was not fraudulent under

Arizona's uniform fraudulent conveyance act.

Turning to Section 548(a)(1), a trustee "may avoid any transfer. . .of an interest of

the debtor in property . . .that was made or incurred within 1 year before the date of the filing of

the petition, if the debtor voluntarily or involuntarily–

>           (A) made such transfer . . . with actual intent to hinder, delay, or defraud
>
>           any entity to which the debtor was or became, on or after the date that such
>
>           transfer was made . . .; or
>
>           (B) (i) received less than reasonably equivalent value in exchange for
>
>           such transfer . . .; and
>
>           (ii) (I) was insolvent on the date that such transfer was made. . ., or became
>
>           insolvent as a result of such transfer. ."[15]

Thus, the trustee must initially prove that (1) the debtor transferred the property, and (2) such transfer took place within one year prior to the filing of the debtor's bankruptcy petition. Upon making this initial showing, the trustee is then required to prove that the debtor transferred the property with actual intent to defraud[16] or that the transfer was constructively fraudulent.[17]

A. Whether the transfer simply quieted title in the Defendant.

The Defendant argues that the Court should never reach the issue of whether a fraudulent transfer has occurred under any provision of the Bankruptcy Code, because the Defendant has always been the legal and equitable owner of the Anthem Property, and the Debtor's transfer in April 2005 was simply to correct an error in the title. First, the Court

---

**15.** 11 U.S.C. §548(a)(1)(A), (B)(West 2008). The Court has included those provisions which are relevant to the controversy. The administrative case was filed prior to October 17, 2005, the effective date of most of the provisions of BAPCPA. *See* BAPCPA, Pub.L.No. 109-8, §1501(b)(1), 119 Stat. 23, 216 (stating that unless otherwise provided, the amendments do not apply to cases commenced under title 11 before the effective date of BAPCPA); *also see* §1406(b) - "Avoidance Period–The amendment made by section 1402(1) shall apply only with respect to cases commenced under title 11 of the United States Code more than 1 year after the date of enactment of this Act." As a result, the Court shall utilize the one-year, look-back period under prior law.

**16.** *See* 11 U.S.C. § 548(a)(1)(A).

**17.** *See* 11 U.S.C. § 548(a)(1)(B).

8

questions the raising of such an issue as a part of a fraudulent conveyance action. Normally a debtor or interested party seeking to quiet title in his or her name would need to commence an adversary proceeding under applicable law.[18] However, even if the Court considers such an argument as a type of defense to a claim of a fraudulent conveyance, the facts do not support the Defendant's argument.

The Defendant owned certain property in New Jersey with her husband prior to his death. However, the evidence reflects that after his death, the Debtor acquired a joint tenancy interest in the New Jersey property. Thereafter, as the Debtor and the Defendant readied the property for sale, they incurred a joint obligation to refurbish it. After the property was sold, the Debtor and the Defendant received a cashier's check, which was jointly payable to them, in the amount of $200,000. The Debtor and the Defendant incurred a joint obligation to purchase the Property, and they held the Anthem Property as a joint tenancy with a right of survivorship. The Debtor used funds from her deposit account to pay the mortgage on the Anthem Property, and she claimed various interest and other deductions on her 2005 Federal Tax Return. The Debtor also listed her interest in the Property on Schedule A, as part of the documents that she provided under penalty of perjury in support of her bankruptcy petition. She had no explanation for why the Property was solely listed in her name. She also had no explanation for her failure to list the transfer of the Property to her mother on April 25, 2005. If the Property should be placed solely in her mother's name, the Debtor had no explanation for why she continued to make the mortgage payments and increased the amount of the indebtedness on the Property, by as much as $100,000, from 2005 to 2008. In other words, the Debtor treated the Property as her own.

Under Arizona law, a court may, in equity, quiet title in the individual that is the rightful legal and equitable owner of real property. However, the case law is clear that the facts must support an equitable remedy. Morales v. Trans World Airlines, Inc., 504 U.S. 374, 381, 112

---

**18.** As to quieting title in a bankruptcy case, the Bankruptcy Rules require that an adversary proceeding be commenced. *See* Rule 7001(2).

9

1  S.Ct. 2031, 2035, 119 L.Ed.2d 157 (1992); <u>Mort v. United States</u>, 86 F.3d 890, 892 (9th Cir.

2  1996); <u>Continental Airlines, Inc. v. Intra Brokers, Inc.</u>, 24 F.3d 1099, 1104 (9th Cir. 1994).

3  ;<u>Kennedy v. Morrow</u>, 77 Ariz. 152, 268 P.2d 326 (1954).   The Defendant has shown no credible

4  facts which would support the Defendant's argument that the Anthem Property should simply

5  remain in the Defendant's name.

6

7  B.  Whether A Transfer Occurred Under Section 548.

8           The Defendant raises a number of points under this issue, such as the Debtor had

9  no interest in the Anthem Property, and that even if she had such an interest, nothing of value

10 was conveyed.  Finally, the Defendant also asserts that the transfer, because it involved

11 homestead property, is not a "transfer" within the definition of the fraudulent transfer provisions

12 of the Bankruptcy Code.

13           1.  Whether the Debtor had an interest in the Property.

14           Pursuant to 11 U.S.C. § 548(a)(1), a transfer of property by a debtor may be

15 avoided if such "transfer. . . was made. . .on or within 1 year before the date of filing the

16 petition."  11 U.S.C. §101(54) defines a transfer as "every mode, direct or indirect, absolute or

17 conditional, voluntary or involuntary, of disposing of or parting with property or with an interest

18 in property. . ."

19           The Defendant argues, as a corollary to the fact that legal and equitable title

20 should be vested in her, that the Debtor had no interest in the Property that was transferred.

21 Certainly, at the time of the transfer, the Debtor had an interest in the Property as a joint tenant,

22 with the right of survivorship; that is, if the Defendant predeceased her, the Debtor would

23 succeed to the Defendant's interest in the Anthem Property and own it outright.  However,

24 Section 548 of the Bankruptcy Code does not provide a definition of "property" or an interest in

25 property.  Consequently, the Court must look to applicable state law to determine the definition.

26 <u>In re Loken,</u> 175 B.R. 56, 60 (9th Cir. BAP 1994); <i>see also,</i> <u>In re Bright,</u> 241 B.R. 664 n.3 (9th

27

28                                                    10

1   Cir. BAP 1999).

2          Since the real estate at issue is located in the State of Arizona, the Court will

3   analyze applicable Arizona law.  An individual who has a joint tenancy interest in real property

4   has an interest in property under Arizona law.  <u>Hardine v. Pioneer Nat. Title Ins,</u> 145 Ariz. 83,

5   699 P.2d 1314 (Ariz. App. 1985): <u>Brant v. Hargrove,</u> 129 Ariz. 475, 632 P.2d 978 (Ariz. App.

6   1981).  Such an interest is described as each joint tenant owns an undivided interest in the

7   property, and if one tenant dies, the survivor holds the entire interest in the property.  <u>Brant,</u>

8   *supra.*  Moreover, a joint tenant may convey or encumber his joint tenancy interest without the

9   other tenant's consent or knowledge.  <u>Brant</u>, *supra* at 477 and 980.  Thus, the Debtor had an

10  interest in the Anthem Property under Arizona law for purposes of Section 548.

11         It is also useful in determining whether the Debtor had an interest in the Property

12  to analyze how the Debtor treated the Property for federal income tax purposes.  The Debtor

13  listed the Defendant as a dependent on her Tax Return.  The Debtor also included a mortgage

14  interest expense in the amount of $10,792 on her Schedule A, Itemized Deduction worksheet.[19]

15  According to the Debtor's testimony, this deduction belonged to the Defendant, but the Debtor

16  included it on her Tax Return since she had listed the Defendant as a dependent.  To be eligible

17  for the mortgage interest deduction, "the mortgage must be the obligation of the taxpayer

18  claiming the deduction, not the obligation of another."  <u>Nair v. Comm'r</u>, T.C. Summ. Op. 2007-

19  116, 2007 WL 1975317; *See also* <u>Golder v. Comm'r</u>, 604 F.2d 34, 35 (9th Cir. 1979).  "Where

20  mortgaged property is jointly owned and the co-owners are jointly liable on the mortgage[,] each

21  owner is entitled to a deduction for the interest that he actually pays out of his own funds."

22  <u>James A. Petrie IV v. Comm'r</u>, T.C. Memo 1995-592, 1195 WL 735304 *citing* <u>Castaneda-</u>

23  <u>Benitez v. Comm'r</u>, T.C.Memo 1981-157, 1981 WL 10465; <u>Colston v. Burnet</u>, 59 F.2d 867, 870

24  (DC Cir.), *cert. denied*, 287 US 640 (1932).

25

26         **19.** The Debtor also claimed a deduction for the points that she paid in acquiring the

27  loan.

28                                              11

1    The Debtor's testimony was not credible that she did not have any interest in the

2    Anthem Property and that the April 25, 2005 transfer to the Defendant was simply harmonizing

3    the Defendant's legal and equitable title in the Anthem Property.  The Debtor's actions reflected

4    what her interest was in the Property.  When the Debtor listed the Defendant as a dependent on

5    the Debtor's Tax Returns, she was obtaining an additional exemption on her Tax Return; it did

6    not turn her individual return into a joint return, nor did it relieve the Defendant of her burden to

7    file a tax return.[20]  The mortgage interest deduction was an independent deduction available to

8    each party to use on her individual return based on the amount of interest actually paid by that

9    party.  By signing the tax return which included the benefit of the entire mortgage interest

10   deduction, the Debtor was admitting that she was making the mortgage payments on the Anthem

11   Property.  If she were only making a portion of the payment, or if she were simply making the

12   payment on behalf of the Defendant, at least on this record, she had no ability to claim the

13   mortgage interest deduction on the Debtor's 2005 Tax Return.  Finally, since the Debtor was

14   also reducing the principal amount of the loan on the Anthem Property with each mortgage

15   payment, the Debtor's equitable interest in the Anthem Property was also increasing over time.

16                    2.  Whether the interest of the Debtor had value.

17             There are no Arizona cases which are directly on point as to how to value a joint

18   tenancy interest.  However, in determining how to make welfare payments to such an interest

19   under Arizona law, an appellate court has apportioned the interest, allowing one-half of the value

20   of the property to be allocated to the one joint tenant.  Crahan va. Allen, 463 P.2d 102, 104

21   (Ariz. App. 1970).  Therefore, as a guideline, this Court may conclude that the Debtor had an

22   interest in the Anthem Property which was equal to one-half of the value of the Property at the

23   time of the transfer in April 2005.

24   ────────────

25        **20.**  There are limited exceptions which provide that a dependent may not have a filing
     requirement if the dependent makes less than a specified amount each year.  But the Defendant
26   failed to provide the necessary evidence to support any exception.  *See* I.R.C. §§151, 152, and
     6012.
27

28                                         12

1    While there was no testimony or evidence presented by an appraiser as to the

2    value of the Debtor's survivorship interest in the Anthem Property, the Court need not establish

3    the precise value. The Court may take into account the Debtor's Schedules, executed under

4    penalty of perjury, as to some indication of the value of the Debtor's interest. As noted

5    previously, the Debtor listed her the interest in the Anthem Property, on her Schedule A, with a

6    value of $240,000. She also noted a lien encumbering the Property in the amount of $98,000.

7    However, the Debtor and the Defendant purchased the Property in September 2004, which had a

8    value of $370,000 at the time.

9    By October 2005, the Arizona real estate market was still "heated," and the value

10   of real estate was increasing in value. Thus, it is reasonable to assume that the Anthem Property

11   had a value well in excess of $370,000 at the time of the transfer in April 2005. Since the Debtor

12   listed her interest in the Property, as of October 2005, with a value of $240,000, it is reasonable

13   for the Court to assume that without the transfer, the Debtor would only have a one-half interest

14   in the Property, and the value of the Debtor's one-half interest was $240,000 in October 2005.

15   Thus, the Property would have had, but for the transfer, twice the value of her interest, or a value

16   of $480,0000. If the Trustee had been able to force a sale of the Property in October 2005, he

17   could have paid off the first lien in the amount of $98,000 and even paid the Defendant an

18   exemption of $150,000 for the Property. He would still have had $191,000 in potential proceeds

19   to distribute to the creditors of the estate.[21]

20   The Defendant also argues that even if the Debtor has an interest in the Property,

21   if the first lien amount of $98,000 is subtracted from the sum of $240,000, only the amount of

22   $142,000 remains, less than the Arizona homestead exemption  However, there is nothing in the

23   record to support the Debtor's assertion that the entire interest in the Property only had a value of

24   $240,000. As noted previously, the Debtor and the Defendant purchased the Property in October

25

26   **21.** $480,000 minus $98,000 = $382,000. Divide by 2, and this leaves $191,000 as the
     Debtor's potential interest in the Property. As will be set forth hereinafter, the Debtor would be
27   unable to claim her own homestead exemption as a result of the operation of Section 522 (g).

28                                              13

1   2004 for the appraised amount of $370,000. The Arizona real estate market became heated, and

2   the value of real estate only increased over the next year. It is reasonable to assume that the

3   value of the Property was at least in the amount of $480,000 in April 2005, with the Debtor's

4   one-half interest having a value of $240,000 as listed on her Schedules. Based upon the

5   foregoing, the Court concludes that in April 2005, the Debtor had an interest in the Anthem

6   Property which had value.

7           3.  Whether the transfer of exempt property is excepted from the provisions of
            Section 548.

8
9           The Defendant provides an interesting argument in noting that homestead

    property is excepted from the parameters of Arizona's Uniform Fraudulent Transfer Act
10
    ("UFTA"), and since the Anthem Property was homestead property, there was no property that
11
    could be transferred for purposes of Section 548.
12
            Under Arizona's UFTA, assets do not include "property to the extent [it is]
13
    generally exempt under nonbankruptcy law" and a transfer is defined as the "disposing of or
14
    parting with an asset or an interest in an asset." A.R.S. § 44-1001(1)(b), (9). In reading these
15
    sections together, the Defendant also argues that since the Anthem Property is exempt under
16
    Arizona's homestead exemption, the Property may not be considered an asset under Arizona's
17
    UFTA and, thus, may not be challenged as a fraudulent transfer under Arizona's UFTA.
18
    Presumably the Defendant believes that if the transfer is excepted from the provisions of
19
    Arizona's UFTA, it may not be set aside as a fraudulent conveyance under the Bankruptcy Code.
20
             However, there is no similar provision in Section 548 which carves out an
21
    exception for property which is exempt under federal or state law. Thus, since the joint tenancy
22
    interest is "property" under Arizona law, it is subject to the provision of Section 548 which
23
    allows the Trustee to "avoid any transfer of an interest of the [Debtor] in property." Next, since
24
    there is no provision, as under Arizona's UFTA, which carves out homestead property or other
25
    property which is exempt under "nonbankruptcy" law from the operation of Section 548, the
26
    Debtor's joint tenancy interest remains subject to avoidance. Congress has not chosen to provide
27

28                                                    14

such an exception within the parameters of Section 548, and this Court sees no basis to include one in its analysis of the Section. *Cf.* U.S. v. Ron Pair Enterprises, 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989)(holding that where the language of a statute is plain, the Court has no choice but to follow the mandate of the language).

Finally, the Debtor chose to transfer her interest in the Property by Warranty Deed on April 25, 2005. Under Arizona law, the use of a warranty deed would prohibit a *bona fide* purchaser from acquiring a superior interest in the Property. Edwards v. Stewart Title & Trust of Phoenix, Inc., 156 Ariz. 531, 753 P.2d 1187 (Ariz. App. 1988); Bailey v. Kuida, 69 Ariz. 357, 213 P.2d 895 (Ariz. 1950). Such a method is a voluntary, absolute transfer by the Debtor of her joint tenancy interest in the Anthem Property to the Defendant. Thus, the Trustee has shown, at least as to Section 548 of the Bankruptcy Code, that the Debtor had an interest in property, that the interest had value, and that the Debtor transferred that interest within the 1-year period prior to the filing of her bankruptcy petition. As such, the Trustee has proven all of the preliminary elements of a claim under Section 548.

C. Whether the Transfer Was Actually Fraudulent as to the Debtor's Creditors Under Section 548.

A transfer is actually fraudulent when a debtor makes a transfer with "actual intent to hinder, delay, or defraud any entity to which the debtor was or became. . . indebted."

11 U.S.C. § 548(a)(1)(A). A debtor's intent may be established by circumstantial evidence. In re Perez, 954 F.2d 1026 (5th Cir. 1992); In re Beverly, 374 B.R. 221, 235 (9th Cir.BAP 2007). In assessing this evidence, the courts consider "badges of fraud" which are "circumstances so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent" and are allowed as proof "due to the difficulty of proving actual intent to hinder, delay[,] or defraud creditors." In re Sharp Int'l Corp., 403 F.3d 43, 56 (2d Cir. 2005), *quoting* Wall St. Assocs. v. Brodsky, 257 A.D.2d 526, 59 (1st Dept. 1999).

15

In considering circumstances commonly associated with fraudulent transfers, bankruptcy courts often look to state law for guidance when available. Although the Court has concluded that the Trustee may not utilize Arizona's UFTA to avoid the transfer of the Anthem Property under Section 544(b), the Court may still review Arizona law as to certain non-exclusive factors which a court may rely on in determining whether actual intent exists, such as:

(1) Whether the transfer or obligation was to an insider;

(2) Whether the debtor retained possession or control of the property transferred after the transfer;

(3) Whether the transfer or obligation was disclosed or concealed;

(4) Whether, before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5) Whether the transfer was of substantially all of the debtor's assets;

(6) Whether the debtor absconded;

(7) Whether the debtor removed or concealed assets;

(8) Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.

A.R.S. § 44-1004. When performing this analysis, it is the transferor's intent at the time of transfer which is crucial. In re Beverly, supra at 235. Moreover, the trustee must only show the presence of the intent to hinder, or the intent to delay, or the intent to defraud; it is not necessary for the trustee to show the presence of all three types of intent in order to avoid the transfer. Id.

In this matter, the Debtor transferred her interest in the Property to her mother who would be considered an insider. 11 U.S.C. §101(31)(A)(I); In re Strickland, 230 B.R. 276 (Bankr.E.D.Va. 1999). The Debtor's testimony also reflects that she continued to make mortgage payments concerning the Property, and she availed herself of the mortgage interest deduction on her 2005 Tax Return. The Debtor also retained possession of the Property by

16

continuing to reside there. The transfer was also concealed in the sense that when the Debtor

filed her bankruptcy petition, she disclosed her interest in the Property, but did not disclose any

pre-petition transfers. It was only when the Trustee investigated the Debtor's affairs that he

learned that she had transferred the Anthem Property to her mother pre-petition. The Debtor has

stipulated that at the time she transferred the Property, she was insolvent. The Debtor also

admitted, at trial, that she received no consideration for the transfer of her interest in the

Property. Although the Trustee has not shown all of the factors enumerated above, he has

provided sufficient evidence that the Debtor had the requisite actual intent to defraud.

Other facts to be considered are when the Debtor prepared her bankruptcy

petition, she valued her interest in the Anthem Property, as listed on her Schedule A, in the

amount of $240,000, yet the Debtor had purchased the Anthem Property with the Defendant

approximately one year earlier, at an appraised value of $370,000.[22] Arguably given the

increasing value of real estate in the Arizona market at the time, the Anthem Property could have

had a value of $480,000 in October 2005, when the Debtor filed her bankruptcy petition. Thus,

the Debtor's one-half interest in the Property, or the amount of $240,000, could have been placed

on the Debtor's Schedules to reflect her interest. As such, the Trustee could have potentially

sold the Property for the aggregate amount of $480,000, paid the first lien of $98,000, and even

paid the Defendant a homestead exemption of $150,000. This would have still left the Trustee

with the approximate amount of $191,000 as the value of the Debtor's one-half interest for

distribution to her unsecured creditors.[23] Of course, the Arizona real estate market has

dramatically declined in value since October 2005.

Given the Debtor's evasive testimony about the Property, including her statement

that the Property should not have been listed on her Schedules at all, the Court is left with the

---

**22.** Both the purchase of the Property, in October 2004, and the bankruptcy filing, in
October 2005, occurred prior to the decline in the Arizona real estate market.

**23.** $480,000 minus $98,000 = $382,000. Divide this sum by one-half, and the Trustee
has the sum of $191,000 available to creditors.

17

unsupported testimony of the Debtor that a residence which she and her mother had purchased in October 2004, for an appraised value of $370,000, somehow dramatically declined in value to $240,000, as of October 2005, at a time when the value of Arizona real estate was still increasing exponentially.  Moreover, by listing the $98,000 secured claim against the Property, which the Debtor stated on her Schedules had a value of $240,000, the Debtor was attempting to claim her entire interest in the Property as exempt and remove it from the scrutiny of the Trustee. The Debtor had also already transferred her interest in the Property to the Defendant, but had not listed that transfer in any part of her Schedules.  The Court can find no reason for the numerous inaccuracies in the Debtor's Schedules other than the Debtor's intent to hide the Anthem Property from her creditors and mislead the Trustee.

Based upon the foregoing, the Court concludes that the Debtor had the actual intent to hinder, delay, or defraud her creditors, and the transfer was "actually fraudulent" pursuant to 11 U.S.C. § 548(a)(1)(A).


D.  Whether the Transfer was Constructively Fraudulent as to the Debtor's Creditors under Section 548.

The Trustee further argues that the transfer of the Property was constructively fraudulent under 11 U.S.C. § 548(a)(1)(B).[24]  Pursuant to 11 U.S.C. § 548(a)(1)(B), a transfer may be avoided if the debtor "received less than reasonably equivalent value in exchange for such transfer or obligation" and "was insolvent on the date that such transfer was made. . . or became insolvent as a result of such transfer or obligation."  A person is insolvent when the person's debts are greater than that person's property "at a fair valuation, exclusive of property

_____

**24.** The Debtor mentioned In re Gustafson, Case No. 06-72727 (W.D. Ark. 2008) (mem.) at the hearing.  However, the In re Gustafson court denied the trustee's attempt to avoid a fraudulent transfer because the trustee did not provide evidence sufficient to establish that the debtor was insolvent at the time of the transfer.  Since the parties have stipulated to the Debtor's insolvency and the Trustee has provided evidence of the Debtor's financial condition at the time the Property was transferred, the Court finds In re Gustafson inapplicable to the present case.

18

transferred, concealed, or removed with intent to hinder, delay or defraud such [person's] creditors." 11 U.S.C. § 101(32). The property calculation does not include "property [that was] transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors."

In considering the first prong of the analysis of whether the Debtor received reasonably equivalent value in exchange for the transfer of the Property, the Court finds the Debtor received little or no consideration from the Defendant. The Warranty Deed had the standard language that the Debtor received "$10 and other good and valuable consideration."[25] If the Court relies on the language of the Warranty Deed alone, the Debtor received $10 for the transfer of an interest which had a potential value of $191,000 to unsecured creditors, assuming that the $98,000 first lien was paid, and the Trustee allowed an exemption of $150,000 to the Defendant in the Property.[26] As such, the Debtor received little or no value for her interest in the Property. Accordingly, the Debtor did not receive "reasonably equivalent value" in exchange for her property interest.

To determine whether the Debtor was insolvent at the time of the transfer, the Court must simply do an analysis of the Debtor's assets and the Debtor's liabilities, exclusive of the transferred Property. 11 U.S.C. §§548(a)(1)(B)(ii)(I), 101(32). Based on the stipulation of the parties, at the time of the transfer, the value of the Debtor's assets was less than the amount

---

**25.** The Warranty Deed provides in pertinent part:
> For the consideration of TEN and NO/100 DOLLARS, and other valuable considerations, I or we, the grantor does convey to . . .the Grantee Lucy N. Roca the following described property situate in Maricopa County, Arizona: Lot 43 Anthem Unit 49 . . .

*See* Exhibit 6.

**26.** The Property had a value of $480,000 minus the first lien of $98,000 = $382,000. The Debtor's one-half interest would be $191,000. The Debtor would not be entitled to a homestead exemption as a result of 11 U.S.C. §522 (g).

of the Debtor's liabilities.[27]   Thus, the Court finds that the Debtor transferred property to the Defendant for less than reasonably equivalent value at a time when the Debtor was insolvent, making the transfer fraudulent under 11 U.S.C. § 548(a)(1)(B).

E.  Whether the Trustee May Recover the Property or the Value of the Transfer of the Debtor's Interest in the Property Under Section 550.

The Trustee requests that the Court allow the estate to recover the value of the transferred Property.  Upon finding that a Debtor has fraudulently transferred property, "the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property" from the transferee.  11 U.S.C. § 550(a).  Thus, the preferred remedy for a trustee is to recover the property which has been fraudulently transferred, and the Court must exercise its discretion to order that the value of the property be transferred instead. In re Straightline Investments, Inc., 525 F.3d 870 (9th Cir. 2008); In re Schwartz, 383 B.R. 119 (8th Cir. BAP 2008)(court has discretion to decide which remedy is appropriate under facts of case); In re Fehrs, 391 B.R. 53 (Bankr.D.Idaho 2008)(money judgment appropriate when return of real estate will injure innocent parties).

The Trustee did not introduce any evidence as to the value of the Debtor's one-half interest in the Property at the time of the April 25, 2005 transfer.  As discussed above, the Court is able to place certain values on the Debtor's one-half interest to conclude that the Debtor had an interest in the Property, and that her interest had value, before the Property was transferred.  However, given that the Debtor had a joint tenancy interest, with the right of survivorship, the Court may only conclude that the Debtor's interest had some value.  At the time of the transfer on April 25, 2005, the Property had a value of roughly $480,000, as outlined above.  If the first lien in the amount of $98,000 is subtracted, and the remaining equity of $382,000 is divided in one-half, the Debtor's interest, at first blush, is $191,000.  However, if the

---

**27.** Docket Entry No. 22, ¶6.

Case 2:07-ap-00478-SSC    Doc 26    Filed 04/17/09    Entered 04/17/09 14:20:54    Desc
Main Document        Page 20 of 24

Debtor's interest were sold at auction by the Trustee, presumably the market would have to account for the fact that there was a possibility that the Debtor would predecease her mother, which would wipe out the purchaser's interest in the Property. The Trustee has provided no valuation evidence as to this risk. Therefore, the Court is unable to place a value on the Property with such certainty that it is able to order the Defendant to turn over said value to the Trustee.

11 U.S.C. §363(h) considers the possibility of the sale of the estate's and the co-owner's interest in the Property. However, to do so, the Trustee must make a showing that--

> "(1) partition in kind of such property among the estate and such co-owners is impracticable; (2) sale of the estate's undivided interest in such property would realize significantly less for the estate than sale of such property free of the interests of such co-owners; (3) the benefit to the estate of a sale of such property free of the interests of co-owners outweighs the detriment, if any, to such co-owners; and (4) such property is not used in the production, transmission or distribution, for sale, of electric energy or of natural or synthetic gas for heat, light or power."

The Trustee would be required to bring an adversary proceeding if he wished to pursue such a remedy, and he has failed to do so at least as of this time.[28] This leaves the Trustee with something of a Pyrrhic victory. The Court may require that the Defendant execute a deed granting the bankruptcy estate an undivided, one-half interest in the Property. However, given the current value of the Property, the amount of the liens against the Property, and the Defendant's homestead interest, the Trustee would have little value to recover for the estate after any sale, if he were to succeed under Section 363(h). Unfortunately, the Court see no other alternative based upon the facts presented. The Court concludes that the Trustee is entitled to a recovery of the Debtor's interest in the Property. If the Trustee wishes to pursue such a remedy, he may lodge a form of judgment so providing.

---

**28.** *See* Fed.R.Bank.P. 7001 (3).

21

F.  Whether the Trustee may Avoid the Transfer under Arizona's Uniform Fraudulent Transfer Act, as Incorporated by Section 544 (b).

Although not emphasized at the time of trial, the Trustee also included a count that the transfer from the Debtor to the Defendant be avoided pursuant to Section 544(b) of the Bankruptcy Code.  Section 544(b) provides, in relevant part:

> (B) Except as provided in paragraph (2), the trustee may avoid any transfer of an
> interest of  the debtor in property or any obligation incurred by the debtor that is
> voidable under applicable law by a creditor holding an unsecured claim that is
> allowable under section 502 of this title or that is not allowable only under section
> 502(e) of this title.[29]

In this case, since the Property is located in Arizona, the applicable law would be Arizona's UFTA, which states that the transfer of "generally exempt" property is not subject to the provisions of the Act.[30]  There is no case law or commentary which discusses or interprets the meaning of that particular phrase.  Presumably the transfer of homestead property from one spouse to the other or from one family member to another would be within the parameters of the phrase.  For instance, the Supreme Court first addressed the issue of whether a transfer of homestead property could be a fraudulent conveyance when Arizona was still a Territory.[31]  At the time, the homestead consisted of land, together with the dwelling house, which did not exceed the value of $5,000, and which had been selected by the owner as the homestead.  Luhrs

---

**29.** 11 U.S.C. §544(b)(1) (West 2008).

**30.** *See* §44-1001(1), which states that "Asset" means property of a debtor, but asset does not include any of the following: . . .. .(b) Property to the extent that it is generally exempt under nonbankruptcy law." and §44-1001(9), which states that "Transfer" means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset ..."

**31.** *See* Luhrs, Hancock, et al., 6 Ariz. 340, 57 P.605 (1899).  Arizona did not become a state until 1912.

22

at 345-346, and 606.

The Arizona Supreme Court stated that the law then provided that the homestead exemption excluded creditors from all remedies that they had in all courts, noting "No execution or other writ could be made a lien against [the homestead], nor could the creditor have a claim upon it in any form. Under such circumstances could the homestead be the subject of a fraudulent conveyance? The whole doctrine of annulling fraudulent conveyances rests upon the ground that the creditor has a right to resort to the property, and where he has no such right it is impossible that a conveyance can be deemed fraudulent." Id. at 346 and 607. [32] Arizona law still supports this principle. Ferguson v. Roberts, 64 Ariz. 357, 170 P.2d. 855 (1946). Although the Debtor and Defendant are family members, they did jointly own homestead property. Therefore, the transfer of the Debtor's interest to her mother was a transfer of a "generally exempt" asset, within the meaning of Arizona's UFTA, and not subject to avoidance, since it was excepted from the provisions of the Act. As a result, the Trustee's request for relief under Section 544(b) must be denied.

The Court recognizes that when other courts have addressed the issue of a fraudulent conveyance under applicable state law and Section 548, there has been a synthesis of the analyses, and a similar conclusion has been reached under either Section 548 or Section 544(b) of the Bankruptcy Code. In re Acequia, Inc., 34 F.3d 800 (9th Cir. 1994); In re CyberCo Holdings, Inc., 382 B.R. 118 (Bankr. W.D. Mich. 2008); In re McCarn's Allstate Finance, Inc., 326 B.R. 843 (Bankr. M.D. Fla. 2005). However, when Congress created the two provisions, presumably it was concerned with different types of transfers. Otherwise one of the provisions would be surplusage. The Court should not interpret a provision of the statute in a manner which renders it meaningless. Beck v. Prupis, 529 U.S. 494, 506, 120 S.Ct. 1608, (2000); Li v. Eddy, 324 F.3d 1109 (9th Cir. 2003). Thus, we have the unusual result herein that the transfer is

---

**32.** The Court noted parenthetically that in any event, no party had brought a proceeding to set aside the conveyance as fraudulent. Id. at 347, and 607.

1  fraudulent under Section 548 of the Code, but not under Section 544(b).

2

3

IV. CONCLUSION

4

5        The Court concludes that the transfer was both actually and constructively

6  fraudulent under Section 548 of the Bankruptcy Code.  The Trustee is entitled to a transfer of an

7  undivided, one-half interest in the Property from the Defendant to the estate.  The Court must

8  deny the Trustee's request for relief under Section 544(b).  The Trustee shall lodge an

9  appropriate form of judgment and order in this matter.

10

11        DATED this 17th day of April, 2009.

12

13

14                              Honorable Sarah Sharer Curley
                               U. S. Bankruptcy Judge

Case 2:07-ap-00478-SSC    Doc 26    Filed 04/17/09    Entered 04/17/09 14:20:54    Desc
                Main Document    Page 24 of 24